IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DAVID W. JONES,         : CIVIL ACTION NO.
                           : 1:13-CV-2669-WSD-JSA
        Plaintiff,      :
                           :
        v.              :
                           : **F I N A L   R E P O R T   A N D**
CITY OF ATLANTA et al.,   : **RECOMMENDATION  ON  A**
                           : **M O T I O N   F O R   S U M M A R Y**
        Defendants.   : **JUDGMENT**

Plaintiff David W. Jones filed the Complaint [1] in the above-styled civil action on August 12, 2013, and filed an Amended Complaint [15] with the Court's permission on April 16, 2014. In his Amended Complaint [15], Plaintiff alleges that his former employer, the City of Atlanta (the "City"), and the City's employees named as Defendants, terminated his employment because of his race – in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000, *et seq*., the Fourteenth Amendment, 42 U.S.C. § 1981, and 42 U.S.C. § 1983 – and because of his age, in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621, *et seq*. The action is before the Court on Defendants' Motion for Summary Judgment [43]. For the reasons discussed below, the undersigned **RECOMMENDS** that the District Court **GRANT** Defendants' Motion for Summary Judgment [43].

## I.   FACTS

Unless otherwise indicated, the Court draws the following facts from Defendants' "Statement of Material Undisputed Facts" [43-2] ("Def. SOMF") and Plaintiff's Response [47-4] ("Pl. SOMF") thereto[1].

Furthermore, the Court has not considered assertions of "fact" that are immaterial or are presented as legal conclusions, or that are unsupported by a citation to evidence in the record or asserted only in the party's brief and not the party's separate statement of facts. *See* LR 56.1B(1), NDGa ("The court will not consider any fact: (a) not supported by a citation to evidence . . . or (d) set out only in the brief and not in the movant's [or respondent's] statement of undisputed facts.").

Viewing the evidence in the light most favorable to Plaintiff, as the nonmoving party, the Court finds as follows:

Plaintiff was employed with Defendant City as a Labor Relations Specialist, Diversity Analyst, Human Resources Generalist, Human Resources Administrator, Human Resources Director of Public Works, and Human Resources Director of

---

[1]The Court has reviewed and considered Defendants' Response [53-1] to Plaintiff's Statement of Material Facts [47-4]. However, the Court has not included record citations to these responses to the extent that they are duplicative of those already stated in Defendants' Statement of Material Facts [43-2] and Plaintiff's Response [47-4], or if the Court has deemed them to be immaterial to the disputed legal issues involved in this matter.

Watershed Management from October 8, 2001 until his resignation on May 23, 2012. (Def. SOMF ¶¶ 1-2, 12; Pl. SOMF ¶ 1-29[2]). During his employment, Plaintiff's conduct was bound by the City of Atlanta Code of Ordinances ("the Code"), the City of Atlanta Employee Handbook ("the Handbook"), and other agreements that Plaintiff executed. (Def. SOMF ¶ 3; Pl. SOMF ¶ 1-29). The Code prohibits employees from disclosing confidential information "concerning the property, governing operations, policies or affairs of the city" and from using "such confidential information acquired in an official capacity to advance the financial interest or personal interest of the official, employee, or others." (Def. SOMF ¶ 4; Pl. SOMF ¶ 1-29). The Code defines confidential information as "information which has been obtained in the course of holding public office, employment, an independent contract or otherwise acting as an official or employee, and which information is not available to members of the public under state law or other law or regulation and which the official employee is not authorized to disclose." (Def. SOMF ¶ 5; Pl. SOMF ¶ 1-29). On December 17, 2003, Plaintiff also agreed to comply with the confidentiality protocol set forth in the

---

[2] Plaintiff has labeled a single paragraph as "1-29" in which he admits paragraphs 1-29. (Pl. SOMF ¶ 1-29). Throughout his Statement of Material Facts [47-4], Plaintiff has made blanket admissions under single headings, and for ease of reference, Plaintiff's headings will be cited accordingly.

Department of Human Resources' Ethical Behavior Confidentiality Memo ("the Memo"), which states in pertinent part:

> [The Department of Human Resources] deals with an enormous amount of confidential information. It is the City's Policy to maintain strict confidentiality in the way we handle this information. Personal employee data, employee medical information, employee issues, department budget information, and organizational plans are only a few of the many kinds of information to which we are privy. It is critical that this information is only shared with those whose business it is to know, and that no information is shared prior to its official release, or as provided under the Open Records requirements.

(Def. SOMF ¶¶ 6-7; Pl. SOMF ¶ 1-29). Plaintiff acknowledged that "failure to comply [with the provisions of the Memo] may result in disciplinary actions, up to and including termination." (Def. SOMF ¶ 9; Pl. SOMF ¶ 1-29). The Open Records Act allows people to access public records upon a written or oral request to the lawful custodian of the requested records, unless this information is exempt from the Act. (Def. SOMF ¶ 8; Pl. SOMF ¶ 1-29). Plaintiff reaffirmed his commitment to maintaining confidential information through the City of Atlanta Employee Ethics Pledge that he executed on March 25, 2010, in which he agreed that he would not "disclose any confidential information that [he] learned in [his] capacity as a city employee." (Def. SOMF ¶ 10; Pl. SOMF ¶ 1-29).

Plaintiff became familiar with the City's Equal Employment Opportunity Commission's ("EEOC") policy as he sought to ensure compliance with this policy as a member of the Office of Diversity Management team and investigated EEOC complaints and provided training to prevent sexual harassment as a Diversity Analyst (Def. SOMF ¶¶ 14-18; Pl. SOMF ¶ 1-29). Plaintiff conducted anti-harassment and anti-discrimination trainings from 2003 until 2012. (Def. SOMF ¶ 20; Pl. SOMF ¶ 1-29). His "Sexual Harassment and Prevention Refresher Training" included many examples of prohibited harassing conduct, such as unwanted sexual advances, verbal abuse of a sexual nature, graphic verbal commentary, suggestive comments, and the repetition of inappropriate jokes. (Def. SOMF ¶ 24; Pl. SOMF ¶ 1-29). Plaintiff noted in his presentation that "all City employees are encouraged to report incidents of harassment," and that "managerial and supervisory personnel . . . are *required* to take appropriate prompt action in response" to any information of potential harassment;" otherwise, they could face disciplinary action, up to and including termination. (Def. SOMF ¶¶ 25-26; Pl. SOMF ¶ 1-29). In his various positions with the City as a human resources professional, Plaintiff processed and investigated EEOC complaints and

provided sexual harassment and discrimination prevention training. (Def. SOMF ¶ 36; Pl. SOMF ¶ 32-24[3]).

On April 25, 2011, Defendant Yancy was appointed as Commissioner of Human Resources for the City. (Def. SOMF ¶ 37; Pl. SOMF ¶ 32-24). The Department of Human Resources currently employs approximately 121 people, 85 of whom are over 40 years old and 55 of whom are over 50 years old. (Def. SOMF ¶¶ 60-62; Pl. SOMF ¶ 60-63). Since 2011, approximately 73 employees have been terminated or dismissed or have chosen to resign or retire. (Def. SOMF ¶ 63; Pl. SOMF ¶ 60-63). At the time of Defendant Yancy's appointment, the City's human resources functions were decentralized and individually supervised and managed through the corresponding departments. (Def. SOMF ¶ 39; Pl. SOMF ¶ 32-24). However, in January 2012, the City's human resources functions became centralized, pursuant to the City's Chief Operation Officer and the passing of corresponding legislation, and thus, Defendant Yancy supervised all the individual department heads, including Plaintiff. (Def. SOMF ¶ 40, 42-43; Pl. SOMF ¶ 32-24).

Defendant Yancy sought to form a partnership with the law department to ensure legal oversight and to encourage the inclusion and involvement of the legal

---

[3] Although this heading should presumably state 32-44, Plaintiff has identified it as 32-24, and thus, it will be cited accordingly.

6

department in employment matters, employee relations, and labor matters. (Def. SOMF ¶ 46; Pl. SOMF ¶ 46-55). As a result, the City created a new position, the Director of Labor and Employee Relations, to centralize employee relations using appropriate legal guidelines. (Def. SOMF ¶ 47; Pl. SOMF ¶ 46-55). Before the creation of this position, employment matters, employee relations, and labor matters were handled by two associate commissioners, Jerry Soloman and Alfred Elder. (Def. SOMF ¶ 48; Pl. SOMF ¶ 46-55). However, this restructuring allowed the Department of Human Resources to create consistency and ensure legal compliance in the investigation of complaints, provide formalized training to employees processing and investigating complaints, manage the process for ethics complaints, and unify the processes and protocols for employee relations issues. (Def. SOMF ¶ 52; Pl. SOMF ¶ 46-55). Moreover, the creation of the Director of Labor and Employee Relations position consolidated, modified, revised the qualifications, and upgraded the former roles of Mr. Soloman and Mr. Elder. (Def. SOMF ¶ 55; Pl. SOMF ¶ 46-55).

Defendant Yancy hired Defendant Matthews – an attorney working within the City's employment law group – to serve as the Director of Labor and Employee Relations. (Def. SOMF ¶ 49; Pl. SOMF ¶ 46-55). In this capacity, Defendant Matthews drafted Title VII policies, conducted administrative investigations, drafted and prepared EEOC responses, drafted and prepared position statements, managed

7

the EEOC and Labor and Employee Relations Office, and acted as the point person for the City's civil service board hearings. (Def. SOMF ¶ 50; Pl. SOMF ¶ 46-55). Defendant Matthews spent approximately 50% of her tenure investigating employee conduct. (Def. SOMF ¶ 51; Pl. SOMF ¶ 46-55). To resolve the disparate investigation methods in employee relations, Defendant Matthews composed a training module to provide guidance for the completion of thorough and impartial investigations pursuant to the guidelines set forth in the City's Administrative Investigation Manual. (Def. SOMF ¶ 53; Pl. SOMF ¶ 46-55).

The Department of Human Resources allows employees to file anonymous complaints because "it allows individuals who may be scared to come forward, scared for their jobs, scared of retaliation . . . [a]nd it gives them the ability to present factual allegations" for investigation. (Def. SOMF ¶ 68; Pl. SOMF ¶ 68-76). The City receives about five to six anonymous complaints each month. (Def. SOMF ¶ 69; Pl. SOMF ¶ 68-76). On November 4, 2011, the Ethics and Compliance hotline received a complaint that Plaintiff made racist and discriminatory remarks regarding the work ethic of African Americans in the presence of several colleagues. (Def. SOMF ¶ 71; Pl. SOMF ¶ 68-76). An informal investigation, with Defendant Matthews's consultation, concluded that no evidence substantiated the allegations in this complaint, and thus, Plaintiff was not subject to any disciplinary action. (Def. SOMF

¶ 72; Pl. SOMF ¶ 68-76). The Department of Human Resources received many complaints regarding Plaintiff's unprofessional management style, and on January 16, 2012, this Department received an anonymous complaint alleging that Plaintiff routinely made offensive and degrading comments about other employees, disclosed confidential employee information, and falsified employment documents. (Def. SOMF ¶¶ 65-66, 73; Pl. SOMF ¶¶ 65-66, 68-76). Defendant Matthews, the Director of Employee Relations, led the Department of Human Resources' investigation into these allegations, and on February 13, 2012, Plaintiff was placed on administrative leave with pay pending the resolution of the formal investigation. (Def. SOMF ¶¶ 74-76; Pl. SOMF ¶ 68-76). Defendant Yancy – Plaintiff's direct supervisor – did not participate in the investigation to avoid any real or perceived conflicts of interest. (Def. SOMF ¶ 78[4]; Pl. SOMF ¶ 68-76). Plaintiff was permitted to respond to the allegations, and on February 29, 2012, he did so. (Def. SOMF ¶ 81; Pl. SOMF

---

[4] Plaintiff did not dispute this fact, and thus, it is deemed unopposed. *See* LR 56.1(B)(2), NDGa ("This Court will deem each of the movant's facts as admitted unless the respondent: (i) directly refutes the movant's fact with concise responses supported by specific citations to evidence (including page or paragraph number); (ii) states a valid objection to the admissibility of the movant's fact; or (iii) points out that the movant's citation does not support the movant's fact or that the movant's fact is not material or otherwise has failed to comply with the provisions set out in LR 56.1 B.(1).").

¶ 77-79, 81-82). Plaintiff was also interviewed regarding the allegations, while in the presence of his current counsel. (Def. SOMF ¶ 82; Pl. SOMF ¶ 81-82).

During the investigation, Plaintiff admitted that he discussed the salary of an employee, but Plaintiff disputes the confidentiality of employee salary information. (Def. SOMF ¶ 85; Pl. SOMF ¶ 85-88). Defendants state, and Plaintiff does not specifically dispute, that he also revealed other confidential employee information such as employee classification and employee circumstances in violation of the Code, Plaintiff's Ethics Pledge, and his Ethical Behavior and Confidentiality Agreement. (Def. SOMF ¶ 85; Pl. SOMF ¶ 85-88). At least three witnesses corroborated Plaintiff's disclosures. (Def. SOMF ¶ 86; Pl. SOMF ¶ 85-88). The information that Plaintiff disclosed was not formally requested or provided pursuant to the terms of the Open Records Act. (Def. SOMF ¶ 87; Pl. SOMF ¶ 85-88). One employee with whom Plaintiff shared employee information testified that she "felt it was information [she] didn't need to know, especially since it was regarding [her] supervisor's pay." (Def. SOMF ¶ 88; Pl. SOMF ¶ 85-88).

Plaintiff also admitted that on multiple occasions in the presence of multiple African American female City employees, he made a joke in which he analogized Black women to coffee. (Def. SOMF ¶¶ 89, 91, 105-06; Pl. SOMF ¶ 89-91). Specifically, Plaintiff noted that he "prefer[ed] [his] coffee black like [his] women,

black and bitter. (Def. SOMF ¶ 90; Pl. SOMF ¶ 89-91). Five female witnesses testified that they overheard this comment, and three of Plaintiff's subordinates testified that the comment was derogatory, offensive, inappropriate, and unappreciated. (Def. SOMF ¶¶ 92-93; Pl. SOMF ¶ 92-96). Plaintiff never apologized or expressed any remorse regarding this comment. (Def. SOMF ¶ 94; Pl. SOMF ¶ 92-96). Instead, Plaintiff testified unequivocally that a reasonable person should not and would not be offended by his repeated reference to African American women as black and bitter. (Def. SOMF ¶ 95; Pl. SOMF ¶ 92-96). Plaintiff believes that anyone who found his joke to be offensive is unreasonable, and he defends the propriety of his joke because he has an "odd sense of humor." (Def. SOMF ¶¶ 95-96; Pl. SOMF ¶ 92-96). After reading the Investigative Report, Plaintiff learned that Judy Weston and Sonya Robinson found his comment to be offensive, but he believed that they are individually and collectively unreasonable and/or "have issues." (Def. SOMF ¶¶ 97, 111; Pl. SOMF ¶¶ 97, 98-115). Plaintiff maintains that analogizing African American women to coffee is "obviously meant to be a joke," and he does not recognize the racial or sexual import of the "black and bitter" comment. (Def. SOMF ¶¶ 98-99; Pl. SOMF ¶ 98-115).

Plaintiff alleges that he originally heard the comment in 2008 from Frank Sizer, a former City Corrections Chief who is an African American male. (Def. SOMF

¶¶ 100-01; Pl. SOMF ¶ 98-115). Plaintiff alleges that Mr. Sizer stated – in the presence of Plaintiff and Jerry Soloman, the former Assistant Commissioner of Human Resources – that he liked his women like he liked his coffee, black and bitter. (Def. SOMF ¶ 101; Pl. SOMF ¶ 98-115). Plaintiff never questioned Mr. Sizer about the meaning of his comment. (Def. SOMF ¶ 102; Pl. SOMF ¶ 98-115). Despite their roles as human resources professionals, neither Plaintiff nor Mr. Soloman reported Mr. Sizer's joke. (Def. SOMF ¶ 103; Pl. SOMF ¶ 98-115). Instead, Plaintiff recalls that everyone laughed. (Def. SOMF ¶ 103; Pl. SOMF ¶ 98-115). Mr. Sizer retired from the City on December 23, 2009, and Plaintiff repeated the joke three years later in December 2011.

Plaintiff insists that his audience recognized that his comment was a joke because they laughed, and no one mentioned being offended. (Def. SOMF ¶ 108; Pl. SOMF ¶ 98-115). He concedes that fear of termination could prevent an employee from complaining about a supervisor's misconduct, and that, as a human resources director and investigator, he has discovered instances when an employee would laugh at a comment despite feeling offended. (Def. SOMF ¶ 109; Pl. SOMF ¶ 98-115).

Based on the documentary and testimonial evidence gathered in the investigation, Defendants concluded that: (1) Plaintiff engaged in making offensive/degrading comments inconsistent with the City's personnel policies and

12

expectations; (2) Plaintiff breached confidentiality in his position as Human Resources Director of Watershed Management; and (3) Plaintiff did not engage in unethical conduct regarding concerns of falsification or changes to personnel documentation. (Def. SOMF ¶ 83; Pl. SOMF ¶ 83). Defendant Matthews submitted the final investigative report on March 13, 2012 and recommended the following course of action: Plaintiff "(1) should receive the appropriate discipline pursuant to City policies, (2) all human resources personnel should receive sensitivity and diversity training, and (3) all human resources personnel should receive confidentiality training on an annual basis." (Def. SOMF ¶¶ 112-13; Pl. SOMF ¶ 98-115). Defendants Yancy and Matthews, Bob Godfrey, the City's Chief Employment Counsel, and the City's Chief Operating Officer decided to terminate Plaintiff's employment with the City. (Def. SOMF ¶ 115; Pl. SOMF ¶ 98-115). Plaintiff was terminated for using offensive language and for breaching confidentiality. (Def. SOMF ¶ 116; Pl. SOMF ¶ 116).

On March 28, 2012, Defendant Matthews scheduled an appointment with Plaintiff to discuss the investigation's outcome and the City's decision to terminate his employment, but Plaintiff postponed the meeting so that his counsel could attend. (Def. SOMF ¶¶ 117-18; Pl. SOMF ¶ 117-25). On April 11, 2012, Plaintiff requested extended leave for medical treatment under the Family Medical Leave Act. (Def.

SOMF ¶ 119; Pl. SOMF ¶ 117-25). Defendant Yancy approved the request on April 13, 2012 and advised Plaintiff that his employment would be terminated at the end of his requested leave pursuant to the investigation's outcome. (Def. SOMF ¶ 120; Pl. SOMF ¶ 117-25). On May 16, 2012, Plaintiff informed Defendant Yancy that he was retiring from the City on May 23, 2012. (Def. SOMF ¶ 121; Pl. SOMF ¶ 117-25). Plaintiff alleges that he was forced to retire and take an early distribution of his pension, but notes that he could have accessed his pension at a later date. (Def. SOMF ¶ 122; Pl. SOMF ¶ 117-25). On September 27, 2012, Sherri Dickerson accepted a voluntary demotion to work as Plaintiff's replacement. (Def. SOMF ¶ 129; Pl. SOMF ¶ 129-139). Ms. Dickerson is a 51-year-old African American female who was originally hired by the City in March 1994. (Def. SOMF ¶ 130; Pl. SOMF ¶ 129-139).

Plaintiff does not believe that his termination was based on the investigation's outcome because his disclosure of confidential information and his repetition of a sexually and racially charged joke are insufficient cause to terminate his at-will employment with the City. (Def. SOMF ¶ 125; Pl. SOMF ¶ 117-25). Since Plaintiff's resignation, the City has terminated an African American female employee for her racially insensitive conduct, despite her contention that her actions should be construed as a joke. (Def. SOMF ¶ 127; Pl. SOMF ¶ 127-28). The City has also

terminated a maintenance worker for making racially inappropriate remarks. (Def. SOMF ¶ 128; Pl. SOMF ¶ 127-28).

## II.    DISCUSSION

### A. Summary Judgment Standard

Summary judgment is authorized when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 175 (1970); *Bingham, Ltd. v. United States*, 724 F.2d 921, 924 (11th Cir. 1984). The movant carries this burden by showing the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In making its determination, the court must view the evidence and all factual inferences in the light most favorable to the nonmoving party. *Adickes*, 398 U.S. at 157.

Once the moving party has adequately supported its motion, the nonmoving party must come forward with specific facts that demonstrate the existence of a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party is required "to go beyond the pleadings"

and to present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Generally, "[t]he mere existence of a scintilla of evidence" supporting the nonmoving party's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

When considering motions for summary judgment, the court does not make decisions as to the merits of disputed factual issues. *See id.* at 249. Rather, the court only determines whether there are genuine issues of material fact to be tried. Applicable substantive law identifies those facts that are material and those that are irrelevant. *See id.* at 248. Disputed facts that do not resolve or affect the outcome of a suit will not properly preclude the entry of summary judgment. *See id.*; *Lofton v. Sec'y of Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment.").

If a fact is found to be material, the court must also consider the genuineness of the alleged factual dispute. *See Anderson*, 477 U.S. at 248. An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Id.* at 249-50. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Id.* at 248. Moreover, for factual issues to be genuine, they must have a real basis in the record. *See Matsushita*, 475 U.S. at 587. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). Thus, the standard for summary judgment mirrors that for a directed verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 259.

B. <u>Race Discrimination Claim</u>

Plaintiff alleges that Defendants terminated his employment with the City based on his race, in violation of Title VII, the Fourteenth Amendment, 42 U.S.C. § 1981, and 42 U.S.C. § 1983. *See* Amended Complaint [15] at ¶¶ 45-52.

1. *Standard of Proof under Title VII*[5]

Title VII provides that it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To prevail on a Title VII claim, a plaintiff must prove that the defendant acted with discriminatory intent. *Hawkins v. Ceco Corp.*, 883 F.2d 977, 980-81 (11th Cir. 1989); *Clark v. Huntsville City Bd. of Educ.*, 717 F.2d 525, 529 (11th Cir. 1983). Such discriminatory intent may be established either by direct evidence or by circumstantial evidence. *See Holifield v. Reno*, 115 F.3d 1555, 1561-62 (11th Cir. 1997); *Nix v. WLCY Radio/Rahall Comm.*, 738 F.2d 1181, 1184 (11th Cir. 1984). Additionally, statistical proof may also be used as circumstantial evidence to establish intent. *Carter v. City of Miami*, 870 F.2d 578, 581-82 (11th Cir. 1989).

Direct evidence is defined as evidence "that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption."

---

[5] Plaintiff's §§ 1981 and 1983 claims are analyzed under the same framework as his Title VII claim. *See Rioux v. City of Atlanta*, 520 F.3d 1269, 1275 n.5 (11th Cir. 2008) ("Title VII and section 1983 claims have the same elements where the claims are based on the same set of facts."); *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) ("Both [Title VII and § 1981] have the same requirements of proof and use the same analytical framework.").

BLACK'S LAW DICTIONARY 675 (10th ed. 2014); *see also Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1226 (11th Cir. 1993). Only the most blatant remarks whose intent could only be to discriminate constitute direct evidence. *Clark*, 990 F.2d at 1226; *Carter*, 870 F.2d at 581. "[D]irect evidence relates to actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Caban-Wheeler v. Elsea*, 904 F.2d 1549, 1555 (11th Cir. 1990); *see also Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641-42 (11th Cir. 1998). Evidence that only suggests discrimination, *see Earley v. Champion Intern. Corp.*, 907 F.2d 1077, 1081-82 (11th Cir. 1990), or that is subject to more than one interpretation, *see Harris v. Shelby County Bd. of Educ.*, 99 F.3d 1078, 1083 n.2 (11th Cir. 1996), does not constitute direct evidence.

Instead, evidence that merely "suggests discrimination, leaving the trier of fact to infer discrimination based on the evidence" is, by definition, circumstantial. *Earley*, 907 F.2d at 1081-82. Because direct evidence of discrimination is seldom available, a plaintiff must typically rely on circumstantial evidence to prove discriminatory intent, such as by using the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Tex. Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *See Holifield*, 115 F.3d at 1561-62; *Combs v.*

*Plantation Patterns*, 106 F.3d 1519, 1527-28 (11th Cir. 1997). Under this framework, a plaintiff is first required to create an inference of discriminatory intent, and thus carries the initial burden of establishing a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802; *Combs*, 106 F.3d at 1527.

Demonstrating a *prima facie* case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination. *Jones*, 137 F.3d at 1310-11; *Holifield*, 115 F.3d at 1562; *see Burdine*, 450 U.S. at 253-54. Once the plaintiff establishes a *prima facie* case, the defendant must "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802; *Jones*, 137 F.3d at 1310. If the defendant is able to carry this burden and explain its rationale, the plaintiff, in order to prevail, must then show that the proffered reason is merely a pretext for discrimination. *See Burdine*, 450 U.S. at 253-54; *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983).

A plaintiff is entitled to survive a defendant's motion for summary judgment if there is sufficient evidence to demonstrate the existence of a genuine issue of material fact regarding the truth of the employer's proffered reasons for its actions. *Combs*, 106 F.3d at 1529. A *prima facie* case along with sufficient evidence to reject the employer's explanation is all that is needed to permit a finding of intentional discrimination. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148 (2000);

*see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993); *Combs*, 106 F.3d at 1529.

This *McDonnell Douglas-Burdine* proof structure "was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *U. S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983); *see also Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 594 (11th Cir. 1987). The Eleventh Circuit has held that this framework of shifting burdens of proof is a valuable tool for analyzing evidence in cases involving alleged disparate treatment, but the framework is only a tool. *Nix*, 738 F.2d at 1184. The "ultimate question" is not whether a plaintiff has established a *prima facie* case or demonstrated pretext, but "whether the defendant intentionally discriminated against the plaintiff." *Id.* at 1184 (quoting *Aikens*, 460 U.S. at 713-14); *see also Jones*, 137 F.3d at 1313. The plaintiff retains the ultimate burden of proving that the defendant is guilty of intentional discrimination. *Burdine*, 450 U.S. at 253.

Nevertheless, "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). A plaintiff also may

21

defeat a summary judgment motion by presenting "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* (quotation marks omitted).

    2. *Plaintiff's Prima Facie Case*

Plaintiff does not contend that he has produced any direct evidence of discriminatory intent; thus his Title VII claim of discrimination based on race rests purely on circumstantial evidence and will first be analyzed under the *McDonnell Douglas-Burdine* framework. Under this framework, a plaintiff can generally establish a *prima facie* case of unlawful discrimination under Title VII by showing that: (1) he is a member of a protected class;[6] (2) he was subjected to an adverse employment action by his employer; (3) he was qualified to do the job in question; and (4) his employer treated similarly situated employees outside his protected classification (*i.e.*, those of a different race) more favorably than it treated him. *See*

---

    [6] Although courts continue to include the requirement that a plaintiff establish as part of a *prima facie* case that he or she is a member of a "protected class," it is clear that individuals of any race may pursue claims of employment discrimination under Title VII. *See Wright v. Southland Corp.*, 187 F.3d 1287, 1290 n.3 (11th Cir. 1999) (citing *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 278-80 (1976)). Thus, the key element of the *prima facie* case is establishing that persons outside of the plaintiff's protected classification (*i.e.*, those of a different race) were treated more favorably by the employer. *See Wright*, 187 F.3d at 1290 n.3.

*McDonnell Douglas*, 411 U.S. at 802; *see also Wright v. Southland Corp.*, 187 F.3d 1287, 1290 (11th Cir. 1999); *Holifield*, 115 F.3d at 1562.

It is undisputed that Plaintiff is a member of a protected class as a Caucasian male, and that he was qualified for his job with the City. Although Plaintiff chose to retire before his termination date, that choice was made in the shadow of the Defendants' decision to terminate Plaintiff. Thus, it does not appear that Defendants contest that Plaintiff was subjected to an adverse employment action. The only remaining question is whether the City treated similarly situated employees outside his protected classification (i.e., those of a different race) more favorably than it treated him.

a. Comparator Evidence

Plaintiff argues that the City treated Frank Sizer, a similarly situated employee of a different race, more favorably than it treated him. Pl. Res. [47] at 6-7. Mr. Sizer is a former City Corrections Chief who is an African-American male. (Def. SOMF ¶¶ 100-01; Pl. SOMF ¶ 98-115). Plaintiff alleges that he first heard the "black and bitter" comment in 2008 when Mr. Sizer stated that he liked his women like he liked his coffee, black and bitter. (Def. SOMF ¶ 101; Pl. SOMF ¶ 98-115). Plaintiff points out that the City did not take any disciplinary action against Mr. Sizer for making such a comment, and argues that "[t]he obvious difference" between him and Mr.

Sizer "is that Frank Sizer is African American and David Jones is white." Pr. Res.
[47] at 6-7. These two situations are inapposite. Mr. Sizer made the statement once
in front of Plaintiff and another male employee, neither of whom filed a complaint,
and Plaintiff himself acknowledges that no one filed any complaints against Mr. Sizer
based on this conduct. Pl. Res. [47] at 23. As a result, Mr. Sizer's supervisors were
not notified, and no catalyst existed for the City to begin an investigation into the
propriety of Mr. Sizer's alleged conduct. Thus, there is no proof that the City's
Department of Human Resources learned of Mr. Sizer's comment. In other words,
there was no decision by anyone within the City not to discipline Mr. Sizer for this
conduct, and there is therefore nothing to compare Plaintiff's discipline to.

Moreover, at the time that Mr. Sizer allegedly made the comment, Defendant
Yancy was not the head of Human Resources, so even if there was a decision not to
discipline Mr. Sizer in 2008, such a decision is irrelevant to Yancy's and Matthews's
intent with regard to Plaintiff. By the time Plaintiff raised this claim in this lawsuit,
Mr. Sizer had retired, so it is irrelevant that Defendants Yancy and Matthews did not
initiate any investigation upon learning of the issue now. Defendants have also shown
that, since the time of Plaintiff's termination, they have also terminated the
employment of two other employees, including an African American woman, for
making racially insensitive jokes. In these circumstances, Sizer is not a probative

24

comparator and the facts with regard to him create no issue of fact in this lawsuit. *See Burke-Fowler v. Orange Cnty., Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006) ("[T]o determine whether employees are similarly situated, we evaluate 'whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways.') (quoting *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir.1999)); *see also Holifield*, 115 F.3d at 1562 ("In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways.").

    b.  "Factual Mosaic" Evidence

Plaintiff argues that even if Mr. Sizer is not similarly situated, the "factual mosaic" of this case raises a *prima facie* inference of discrimination and also shows that Defendants' proffered justifications for their actions were a pretext for unlawful discrimination. Pl. Res. [47] at 7 (quotation omitted). Plaintiff is correct insofar as he argues that proof of discrimination does not strictly require a comparator or any other specific formulation of evidence. Plaintiff's "mosaic" argument here, however, fails to support any inference of discrimination to justify proceeding to trial.

Plaintiff does not dispute the authenticity of the anonymous complaint, nor does he dispute that he engaged in the conduct for which Defendants state they

terminated his employment, namely disclosing confidential information and commenting that he prefers his coffee like his women, "black and bitter." Despite acknowledging that the witnesses' testimony is accurate, he questions the legitimacy of the investigation itself because Defendants failed to interview the witnesses he provided, and because Defendant Matthews spearheaded the investigation while under Defendant Yancy's supervision, and that no procedural safeguards existed to ensure that Defendant Matthews was fair and unbiased. *Id.* at 14. He argues that the "faulty nature of the investigation indicates pretext" for the termination of his employment. *Id.* at 16. Plaintiff also contends that Defendant Matthews asked leading questions during the investigation, and he objects to her typing up the statements after interviewing witnesses. For example, she took notes during her interview with Janet Essix, and later gave her a typed written statement. Pl. SOMF ¶¶ 55, 57. However, Plaintiff himself notes that Defendant Matthews allowed Ms. Essix to "read and confirm" that the statement accurately reflected her answers and allowed her to make changes. *Id.* ¶ 57.

Plaintiff further argues that his "black and bitter" comment is not racially derogatory, and he points to Defendant Matthews's deposition testimony that his comment merely *could* be offensive. Pl. Res. [47] at 8-9. However, the anonymous complaints that spurred the investigation noted the offensiveness of Plaintiff's

comment as did those interviewed during the investigation. Plaintiff even acknowledges that "it is understandable that some black women, who did not know [Plaintiff], could have been offended by [his] remarks." Pl. SOMF ¶ 50-51.

Although Plaintiff admits to disclosing some confidential information, he argues that the salary of a public employee is not confidential because such information is subject to an Open Records Act request. Pl. Res. [47] at 9-11. Plaintiff also alleges that the conduct for which he was fired is pretextual because the real reason for his termination is that Defendant Yancy is actively making the Department of Human Resources younger and more African American. *Id.* at 17. In support of this allegation, he references a spreadsheet revealing that as of November 12, 2014, the Department of Human Resources had 7 White employees out of over 100 employees. Def. MSJ [47-4], Ex. 21.

This evidence does not permit an inference of discrimination. As to whether his "black and bitter" comment was sufficiently offensive to justify his termination, that is the sort of second-guessing of business decisions in which the Courts are not to engage. *See Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) ("Federal courts do not sit as a super-personnel department that reexamines an entity's business decisions." ). In any event, Plaintiff's argument that no reasonable person could see anything racially insensitive or offensive in Plaintiff's comment is

simply frivolous. Plaintiff was a ***human resources director*** who joked in front of African-American employees that he liked his women "black and bitter." This was well within the realm of conduct that could be considered highly offensive and inappropriate – whether based on race or not, and whether Plaintiff actually liked "black and bitter" women or merely thought he was being funny. The Court has no business questioning Defendants' decision not to tolerate this conduct, especially considering Plaintiff's position.

The same is true with regard to Plaintiff's second-guessing of Defendants' treatment of his disclosure of salary and other information. Plaintiff's position, essentially, is that although he revealed employee salary information without any formal legal request, that information should not be deemed confidential because Georgia law would have required its disclosure had a proper request been made. But the issue before the Court is not whether employee information should be deemed confidential. It is sufficient that Defendants had a colorable basis to treat this disclosure as a violation. After all, the Georgia Open Records Act has a procedure for requests and disclosure of information, and does not suggest that individual HR employees can take it upon themselves to disclose information about other employees without a proper request through the proper channels. Most importantly, there is no evidence, whether from any contrary treatment of a comparator or otherwise, that

Defendants assessed this conduct to be a violation, and disciplined Plaintiff accordingly, on the basis of race.

Plaintiff's complaint about the methods of Defendant Matthews's investigation also fails. At the threshold, Plaintiff's second-guessing does not establish material flaws in Defendant Matthews's investigation. While Defendant Matthews may not have interviewed all of the witnesses suggested by Plaintiff, for example, Plaintiff does not establish what information these witnesses had on the particular issues being investigated and why a decision by Defendant Matthews to decline interviewing them was unreasonable. After all, Plaintiff had essentially admitted that he made a joke about being attracted to "black and bitter" women in front of African-American and female employees. In any event, even if Defendant Matthews's methods were unfair, rushed or otherwise could be criticized, that would not itself support Plaintiff's claim.

An employer "may terminate an employee for a good or bad reason without violating federal law." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999). Moreover, courts do not determine "whether employment decisions are prudent or fair," and instead determine "whether unlawful discriminatory animus motivates a challenged employment decision." *Id.*, 196 F.3d at 1361. Here, Title VII does not authorize the Court to engage in mini-trials over the fairness or wisdom of a company's internal investigation, including whether unfair

29

or leading questions were asked, whether an investigator should have interviewed different witnesses, or whether a Court or jury agrees with his or her conclusions. Whether Defendant Matthews was an effective or fair investigator after all does not, in itself, prove racial bias. What Plaintiff's case lacks is any evidence that Defendant Matthews failed to employ methods or safeguards in this investigation that Defendant Matthews employed in similar investigations involving targets of different races, or any other evidence pointing to racial bias.

Plaintiff also argues that "prior to Jones firing, defendant Yancy had gone about firing white persons and older persons of all colors. Her actions had made the human resources department consistently more African-American and younger during her tenure." Pl. Res. [47] at 17. While proper statistical evidence can permit an inference of discrimination, Plaintiff does not make an attempt to present anything that a factfinder could properly rely upon here. Indeed, in support of his argument about Defendant Yancy's desire to make the "department consistently more African-American and younger," Plaintiff simply states "Defendants' Exhibits 21 and 22 bear this out." *Id.* Those exhibits are multi-page lists of employees. Plaintiff does not explain how these documents "bear [] out" Defendant Yancy's discrimination or what information presented in these documents should give rise to an inference that Plaintiff was the victim of discrimination. At the threshold, Plaintiff's dismissive

citation to this evidence fails. It is not proper to make such a sweeping argument about pervasive discrimination, only to then cite two dense lists of information with no explanation and ask the Court to figure out how these documents support the point.

Nevertheless, the Court has spent time muddling through these lists despite the lack of any specific argument and direction by Plaintiff. The lists do not appear probative on the question of Defendant Yancy's discriminatory intent. To be sure, Exhibit 21 would suggest that, as of November 2014, the vast majority of employees in the Department were characterized as "Black or African American (Not Hispanic or Latino)." *See* Def. MSJ [43-4], Ex. 21 at 74-77. But this in itself sheds no light on Defendant Yancy's mindset. Among other holes in this evidence, the exhibit does not show the numbers or percentages of White versus African-American applicants for positions, much less specifically during Defendant Yancy's tenure, to allow any assessment of whether African-American candidates were hired at a greater rate than White candidates.

Moreover, Exhibit 22 shows that African-Americans also separated from employment at the Department at a far higher rate than White employees from May 2011 through November 2014. In other words, while African-Americans comprise the majority of the Department, they also terminated employment with the Department

31

at a far greater rate than White workers. In the end, little information can be gleaned from this record of separations one way or the other because there is no indication as to the reason for separation. This list includes those who "have been terminated or dismissed or have chosen to resign or retire." Def. SOMF. ¶ 63. This listing cannot show, for example, that White employees were fired in greater percentages than African-American employees.

Plaintiff has also filed an affidavit in which he states that "[s]ubsequent to my separation from employment with the City of Atlanta, the Department of Human Resources has continued to become less diversified and younger under the leadership of Defendant Yancy." Pl. Dec. [48-1] ¶ 26. Plaintiff offers absolutely no foundational facts supporting his ability to testify to events that occurred entirely after his employ. Plaintiff also attests to Defendant Yancy's personnel decisions to terminate other individuals back in 2011, which was within the period of Plaintiff's employ. *See id.*, ¶ 8. But Plaintiff still does not offer any non-hearsay foundational facts to explain how he could testify about these individuals' separation from the Department, whether those departures were involuntary or not, and who was the decisionmaker.

In short, what Plaintiff offers is a "mosaic" of speculation, unsupported assertions, and second-guessing of business decisions. That is not sufficient to support either a *prima facie* inference of discrimination or that Defendants' proffered

reasons for dismissal were a mere pretext for discrimination.[7] Accordingly, Plaintiff cannot prevail on his claims under Title VII. Likewise, Plaintiff's §1981 and §1983 claims fail as they are analyzed under the same framework as his Title VII claim. *See Rioux*, 520 F.3d at 1275 n.5; *see also Standard*, 161 F.3d at 1330.

C.  Age Discrimination in Employment Act ("ADEA") Claim

Plaintiff also alleges that Defendants terminated his employment with the City because of his age, thereby violating the ADEA. *See* Amended Complaint [1] at ¶¶ 53-55.

The ADEA, which applies to "individuals who are at least 40 years of age," prohibits an employer from "fail[ing] or refus[ing] to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. §§ 623(a)(1) and 631(a). A plaintiff bears the burden of

---

[7] The Court does not separately address the question of pretext because Plaintiff relies on the same evidentiary showing to demonstrate a *prima facie* case as he does to show pretext. Even if Plaintiff's "mosaic" were minimally sufficient to establish a *prima facie* case, which it is not, it falls far below meeting the higher standard of constituting "significantly probative evidence" that Defendants' proffered non-discriminatory reasons for dismissal were pretextual. *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996) Thus, Defendants are entitled to summary judgment on the Title VII claim either way.

proving that age was "the 'but-for' cause of the employer's adverse action." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009). To satisfy this burden, a plaintiff may use direct or circumstantial evidence. *Kragor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012).

As noted, *supra*, Plaintiff has not alleged that he has direct evidence of discrimination. Although age discrimination is not covered by the provisions of Title VII, the Eleventh Circuit has held that the *McDonnell Douglas* framework in analyzing claims of discrimination under Title VII is equally applicable to analyzing claims of age discrimination under the ADEA. *See Walker v. NationsBank of Fla.*, 53 F.3d 1548, 1556 (11th Cir. 1995).[8]

Under this framework, a Plaintiff may establish a *prima facie* case of unlawful discrimination based on age by showing that he: (1) is a member of the protected group of persons over the age of forty; (2) suffered an adverse employment action; (3) was replaced by a person outside the protected group, or at least by a substantially younger person; and (4) was qualified for the job at issue. *See Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir. 1998).

---

[8] The Supreme Court has not expressly approved the application of the *McDonnell Douglas* framework to claims of age discrimination under the ADEA. *See Gross*, 557 U.S. 167, 175 n.2 ("[T]he Court has not definitively decided whether the evidentiary framework of *McDonnell Douglas Corp. v. Green* . . . utilized in Title VII cases is appropriate in the ADEA context.").

Here, Defendants concede that Plaintiff has set forth a *prima facie* case of age discrimination. Def. MSJ [43-1] at 34. However, Defendants argue that they have legitimate, non-discriminatory reasons for terminating his employment, and that Plaintiff has not presented evidence to cast doubt on the propriety of these reasons. *Id.* As noted above, the Court agrees that Plaintiff has failed to show that Defendants provided pretextual reasons for terminating his employment, and the Court finds that Defendants' reasons were not motivated by an unlawful animus. Accordingly, for the same reasons for which Plaintiff's Title VII claims fail, his ADEA claims fail.

### D. Qualified Immunity

Defendants Yancy and Matthews argue that they are entitled to qualified immunity, which protects government officials acting within the scope of their discretionary authority "from liability if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotations and citations omitted). There is no dispute that Defendants were acting within the scope of their discretionary authority when they made the decision to terminate Plaintiff's employment. Defendant Yancy argues that it was within her discretionary authority, as the Human Resources Commissioner for the City, to terminate Plaintiff's employment. Def. MSJ [43-1] at 30. Defendant Matthews contends that her role as

lead investigator into Plaintiff's conduct is within the scope of her discretionary authority as the Director of Labor and Employee Relations. *Id.* Thus, the burden turns to Plaintiff to establish that Defendants Yancy and Matthews's conduct violated clearly established statutory or constitutional rights such that "a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (citations omitted); *see also Saucier v. Katz*, 533 U.S. 194 (2001).

However, as noted *supra*, Plaintiff cannot show that Defendants Yancy and Matthews violated his constitutional rights. As a result, he cannot meet this higher burden of demonstrating that they violated any "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson*, 555 U.S. at 231. Thus, even if Plaintiff had set forth triable claims of race discrimination, Defendants Yancy and Matthews would be entitled to qualified immunity. *See Rioux*, 520 F.3d at 1283 ("[W]hen an adequate lawful motive is present, that a discriminatory motive might also exist does not sweep qualified immunity from the field . . . ."); *see also Johnson v. City of Ft. Lauderdale, Fla.*, 126 F.3d 1372, 1379 (11th Cir. 1997) ("Even assuming that the defendants acted with some discriminatory or retaliatory motives in demoting and discharging [plaintiff], the law did not clearly establish that a reasonable official faced with the same evidence of disobedience and deception should not have disciplined [plaintiff] in the same manner.").

36

## III.   CONCLUSION AND RECOMMENDATION

For the above reasons, the undersigned **RECOMMENDS** that Defendants' Motion for Summary Judgment [43] be **GRANTED**. The Clerk is **DIRECTED** to withdraw the reference to the undersigned.

**IT IS SO RECOMMENDED** this 29th day of June, 2015.

_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE